1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DANNA WILBERG,

11            Plaintiff,                    No. CIV S-07-0591 DAD

12        v.

13   MICHAEL J. ASTRUE,                     ORDER
     Commissioner of Social Security,[1]
14
              Defendant.
15   _____/

16            This social security action was submitted to the court, without oral argument, for

17   ruling on plaintiff's motion for judgment on the pleadings and defendant's cross-motion for

18   summary judgment.  For the reasons explained below, plaintiff's motion is granted, the decision

19   of the Commissioner of Social Security (Commissioner) is reversed, and the matter is remanded

20   with the direction to award benefits.

21                          **PROCEDURAL BACKGROUND**

22            Plaintiff Danna Wilberg first applied for Disability Insurance Benefits under Title

23   II of the Social Security Act (Act) on October 8, 1999, alleging onset of disability on October 7,

24   _____

25        [1]  On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
     Mr. Astrue is substituted as defendant in this suit pursuant to 42 U.S.C. § 405(g) and Fed. R. Civ.
26   P. 25(d)(1).

1998. (Transcript (Tr.) at 82-84.) The application was denied initially in January 2000 and upon

reconsideration in March 2000. (Tr. at 71-81.) Plaintiff filed a new application on August 30,

2000, again alleging onset of disability on October 7, 1998. (Tr. at 151-53.) The application was

denied initially in February 2001 and upon reconsideration in May 2001. (Tr. at 136-46.)

Pursuant to plaintiff's request, a hearing was held before an administrative law judge (ALJ) on

April 9, 2002. (Tr. at 147-48, 530-56). Plaintiff was represented by counsel and testified at the

hearing. (Tr. at 530-56.) In a partially favorable decision issued on May 29, 2002, ALJ Antonio

Acevedo-Torres determined that plaintiff had been disabled since March 28, 2002, but was not

disabled prior to that date. (Tr. at 53-64.) Plaintiff requested review of the decision regarding

the onset of disability date. (Tr. at 47-49.)

On September 25, 2004, the Appeals Council affirmed the ALJ's decision with

respect to the favorable period but vacated it with respect to the period before March 28, 2002.

(Tr. at 395-98.) On remand, the ALJ was required to (1) obtain additional evidence concerning

plaintiff's impairments in order to complete the administrative record; (2) reconsider plaintiff's

residual functional capacity during the period at issue, provide a rationale for and cite evidence

supporting the assessed limitations, and explain the weight given to the medical opinions; and (3)

obtain evidence, if necessary, from a vocational expert regarding the effect of the assessed

limitations on plaintiff's occupational base. (Tr. at 397.) The ALJ was required to offer plaintiff

a further hearing and to issue a new decision for the period before March 28, 2002. (Tr. at 398.)

On remand from the Appeals Council, the ALJ issued a supplemental notice of

hearing on August 4, 2005. (Tr. at 31-34) Plaintiff was again represented by counsel and

testified at the hearing conducted on September 12, 2005. (Tr. at 557-72.) In a decision issued

on November 17, 2005, the ALJ again determined that plaintiff was not disabled prior to March

28, 2002. (Tr. at 16-30.) The ALJ entered the following findings:

> 1.      The claimant meets the nondisability requirements
> for a period of disability and Disability Insurance
> Benefits set forth in Section 216(i) of the Social

Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's fibromyalgia, chronic neck and low back pain, and degenerative changes of the cervical and lumbar spine were considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 prior to March 28, 2002.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision prior to March 28, 2002.

6. The claimant had the following residual functional capacity prior to March 28, 2002: lift 10 pounds occasionally and less than 10 pounds frequently, walk/stand two hours, sit six hours, and occasionally perform postural activities, and she had no mental, visual, communicative, manipulative, or environmental limitations.

7. The claimant was unable to perform any of her past relevant work prior to March 28, 2002 (20 CFR § 404.1565).

8. The claimant was a "younger individual" prior to March 28, 2002 (20 CFR § 404.1563).

9. The claimant had a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10. The claimant had no transferable skills from any past relevant work and/or transferability of skills was not an issue in this case prior to March 28, 2002 (20 CFR § 404.1568).

11. The claimant had the residual functional capacity to perform the full range of sedentary work prior to March 28, 2002 (20 CFR § 404.1567).

12. Based on an exertional capacity for sedentary work, and the claimant's age, education, and work

experience, a finding of "not disabled" is directed
by Medical-Vocational Rules 201.21 and 201.22
prior to March 28, 2002.

13.     The claimant was not under a "disability" as defined
in the Social Security Act, at any time prior to
March 28, 2002 (20 CFR § 404.1520(g)).

(Tr. at 29-30.)

On December 7, 2005, plaintiff requested review of the ALJ's second decision.
(Tr. at 13-15.) The Appeals Council denied the request for review on January 23, 2007. (Tr. at 7-9.) Plaintiff then sought judicial review pursuant to 42 U.S.C. § 405(g) by filing the complaint in this action on March 27, 2007.

## LEGAL STANDARD

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence and the proper legal standards were applied. Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000); Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999). The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. See Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Morgan, 169 F.3d at 599; Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).

A reviewing court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. See Jones, 760 F.2d 995. The court may not affirm the ALJ's decision simply by isolating a specific quantum of supporting evidence. Id.; see also Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a finding of either disability or nondisability, the finding of the ALJ is conclusive, see Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987), and may be set aside only if an

4

improper legal standard was applied in weighing the evidence, <u>see</u> <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1338 (9th Cir. 1988).

In determining whether or not a claimant is disabled, the ALJ should apply the five-step sequential evaluation process established under the Social Security regulations. Title 20 of the Code of Federal Regulations, Section 404.1520, sets forth the test used to assess disability. <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). This five-step process can be summarized as follows:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is conclusively presumed disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

<u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995). The claimant bears the burden of proof in the first four steps of the sequential evaluation process. <u>Yuckert</u>, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. <u>Id.</u>; <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999).

## APPLICATION

Plaintiff argues that the ALJ failed to follow the treating physician rule when he determined her residual functional capacity (RFC), both physical and psychiatric, prior to March 28, 2002. Plaintiff contends that the ALJ erred by giving only minimal weight to the opinion of treating physician Jay Hendrickson, M.D., and no weight to the opinion of treating physician

Mark Yankauer, M.F.T. Plaintiff's argument concerning the ALJ's assignment of weight to the opinions of treating medical professionals in determining physical and psychiatric RFC is addressed below.[2]

A claimant's RFC is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a). The assessment of a claimant's RFC must be "based on all the relevant evidence in [the claimant's] case record." Id. See also Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001). When a claimant requests an administrative hearing, it is the duty of the ALJ to determine the claimant's RFC from the record. 20 C.F.R. § 404.1546(c). It is "the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity," and the ALJ's findings of RFC need not correspond precisely to any physician's findings. Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001). The claimant bears the burden of proof of establishing RFC. Yuckert, 482 U.S. at 146 n.5.

Here, the ALJ determined that plaintiff's fibromyalgia, chronic neck and low back pain, and degenerative changes of the cervical and lumbar spine were severe impairments both prior to and after March 28, 2002. (Tr. at 29, 62.) He found that plaintiff had the physical residual functional capacity, both before and after March 28, 2002, to sit for six hours, walk and/or stand for two hours, perform postural activities occasionally, lift 10 pounds occasionally, and lift less than 10 pounds frequently. (Tr. at 30, 62.) The ALJ found that plaintiff had no mental, visual, manipulative, communicative, or environmental limitations, either before or after March 28, 2002. (Id.) On the basis of these findings, he determined that plaintiff could perform the full range of sedentary work but could not perform her past relevant work as a store demonstrator, either before or after March 28, 2002. (Id.) The ALJ found that plaintiff had a

---

[2] The undersigned notes, however, that this case is before the court only with regard to the ALJ's second decision that plaintiff was not disabled prior to March 28, 2002. The ALJ's initial decision that plaintiff was disabled on March 28, 2002 was affirmed by the Appeals Council, was not before the ALJ on remand, and is not at issue in this court. The undersigned also notes that no medically significant event occurred on March 28, 2002. Rather, on that date, plaintiff attained the age of 50.

high school education but no acquired work skills transferable to skilled or semi-skilled work activities. (Id.) In each decision, the ALJ applied Rules 201.21 and 201.22 of the Medical-Vocational Guidelines to find plaintiff not disabled prior to March 28, 2002, when she was "a younger individual." (Id.) In his first decision, the ALJ applied Rule 202.14 to find plaintiff disabled on March 28, 2002, when she became a person "closely approaching advanced age." (Tr. at 64.)

Rules 201.21 and 201.22 are included in a table of rules applicable to claimants whose RFC limits them to sedentary work. Pt. 404, Subpt. P, App. 2, Table 1. Rule 201.21 is intended for use where the claimant is a person aged 45-49 whose education level is high school graduate or more and whose previous work experience is skilled or semiskilled, with no transferable skills. Rule 201.22 is intended for use where the claimant fits the description contained in Rule 202.21 but has transferable skills. Both rules dictate a finding of not disabled. Rule 201.14, on the other hand, dictates a finding of disabled for a claimant aged 50 to 54 whose education level is high school graduate or more and whose previous work experience is skilled or semiskilled, with no transferable skills. All three rules apply only

> [w]here the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule . . . . However, each of these findings of fact is subject to rebuttal and the individual may present evidence to refute such findings. Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled. In any instance where a rule does not apply, full consideration must be given to all of the relevant facts of the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations.

Pt. 404, Subpt. P, App. 2, § 200.00(a). "Since the rules are predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs, they may not be fully applicable where the nature of an individual's impairment does not result in such limitations, e.g., certain mental, sensory, or skin impairments." Id. at § 200.00(e). In

addition, a decision of disabled may be appropriate for some individuals age 45-49 who do not have the ability to perform a full range of sedentary work.  Id. at § 200.00(h)(3).

Under the Commissioner's regulations, the physical exertion requirements for sedentary work are as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  See Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001). "'Occasionally' means occurring from very little up to one-third of the time."  SSR 83-10, 1983 WL 31251, at *5 (Nov. 30, 1982).  Thus, for purposes of sedentary work, "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting would generally total approximately 6 hours of an 8-hour workday."  Id.

In determining a claimant's RFC, it is well established that the weight to be given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  Lester, 81 F.3d at 830.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Id.  This is so because a treating doctor is employed to cure and has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990).  The ALJ need not give weight to conclusory opinions supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113-14 (9th Cir. 1999); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

"At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons."  Lester, 81 F.3d at 830 (quoting Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)).  "Even if the treating doctor's opinion

is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." Lester, 81 F.3d at 830 (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)). If a treating professional's opinion is contradicted by an examining professional's opinion that is supported by different, independent clinical findings, the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes, 881 F.2d at 751). The opinion of a non-examining professional, without other evidence, is an insufficient basis for rejecting the opinion of either a treating or examining professional. Lester, 81 F.3d at 831.

In the present case, plaintiff was gainfully employed until October 7, 1998, when she was injured in an automobile accident.[3] Treating medical professionals have included Hayne Kelada, M.D., who was the family's doctor at the time of the accident; Ron Martin, D.C., who began treating plaintiff on October 24, 1998; an acupuncturist who treated plaintiff in 1999; Allen Hassan, M.D., an orthopedic and neurologic specialist who began treating plaintiff on January 27, 2000; Jay Hendrickson, M.D. a pain management specialist who began treating plaintiff on December 7, 2000; and Mark Yankauer, M.F.T., a therapist who began treating plaintiff in May 2001, saw her weekly for about six months, and saw her every two weeks thereafter for at least six months. (See Pl.'s Mot. for J. on Pleadings, at 2-23.)

Examining physicians have included David Seminar, M.D., a neurologic specialist who examined plaintiff on November 23, 1998; Neil Wood, M.D., a board-certified internist who evaluated plaintiff on June 2, 1999 and October 27, 1999; Rajiv S. Pathak, M.D., who conducted an internal medicine evaluation as a consultative examiner for the Social Security Administration on December 29, 1999; Christopher Molitor, M.D., who examined plaintiff on January 12, 2000;

---

[3] Plaintiff had stopped her minivan to make a left turn when a utility van ran into the rear of her vehicle at 45 to 50 miles per hour, causing her vehicle to spin around and flip over on the passenger side. Plaintiff hit her chest on the steering wheel, and her left shoulder struck the door. She was seen in an emergency room and has been treated by numerous doctors since then. (See Pl.'s Mot. for J. on Pleadings, at 2-23.)

Pierre Dreyfus, M.D. a board-certified neurologist who examined plaintiff on October 24, 2000; Daniel Powers, M.D., who reviewed various imaging studies on November 15, 2000; Michael J. Sloan, D.C., who evaluated plaintiff on January 8, 2001, at the request of plaintiff's treating chiropractor; R. Singleton, M.D., and S. Mackay, Ph.D., who evaluated plaintiff at the Stanford Pain Management Center in September 2004 and issued a report; Steve McIntire, M.D., who conducted an orthopedic evaluation as a consultative examiner for the Social Security Administration on June 16, 2005; and Mandeep Behniwal, M.D., who conducted a comprehensive psychiatric examination as a consultative examiner for the Social Security Administration on June 18, 2005. (Id.)

Plaintiff challenges the ALJ's treatment of the opinions of treating physician Dr. Hendrickson, which he stated in a Medical Assessment of Physical Ability to Do Work Related Activities form dated March 16, 2001. (Tr. at 23-24, 374-76.) Dr. Hendrickson found plaintiff limited to lifting or carrying five pounds at any one time, standing or walking three hours in an eight-hour day, and sitting three hours in an eight-hour day. (Tr. at 374.) Dr. Hendrickson also found significant postural limitations arising from plaintiff's chronic myofascial pain and opined that she should never climb, balance, stoop, crouch, kneel, crawl, or bend and that she should perform the physical functions of reaching, handling, feeling, pushing, and pulling only occasionally. (Tr. at 375.) Dr. Hendrickson found no limitations on plaintiff's abilities to see, hear, and speak, no impairment of her abilities to perform simple or firm grasping or fine manipulation, and no environmental restrictions. (Tr. at 375-76.) Plaintiff argues that the restrictions found by Dr. Hendrickson, under the Commissioner's own regulations, establish an RFC to perform less than sedentary work.

Plaintiff also challenges the ALJ's treatment of the opinions of treating therapist Mark Yankauer, which he stated in a Mental Functional Capacity form dated April 5, 2002 and in a Psychiatric Review Technique form dated April 26, 2002. (Tr. at 26, 427-28, 429-37.) In the mental functional capacity form Mr. Yankauer indicates that plaintiff would often have

difficulty maintaining attention and concentration and being able to function independently; would have slight problems following work rules, using judgment, interacting with supervisors, and dealing with work stresses; would often have problems understanding, remembering and carrying out complex job instructions, as well as detailed but not complex job instructions; would have a slight difficulty in understanding, remembering and carrying out simple job instructions; and would have a slight difficulty in behaving in an emotionally stable manner and relating predictably in social situations. (Tr. at 427-28.) The psychiatric review technique form reflects depressive syndrome characterized by, among other symptoms, difficulty concentrating or thinking. (Tr. at 432.) Mr. Yankauer found that the following functional limitations exist as a result of plaintiff's affective disorder: restriction of activities of daily living, to a marked degree; difficulties in maintaining social function, to a marked degree; and deficiencies of concentration, persistence, or pace, that would often result in failure to complete tasks in a timely manner. (Tr. at 436.) Plaintiff argues that the ALJ should have credited Mr. Yankauer's assessments and that those assessments establish her disability.

In the administrative decision at issue, the ALJ states that only minimal weight can be given to Dr. Hendrickson's medical source statement because the doctor's records do not contain clinical or diagnostic findings to support his assessment, he did not refer plaintiff to a specialist, he did not refer plaintiff to a pain clinic, he did not hospitalize plaintiff, he did not administer pain injections, he supported his clinical findings with a reference to chronic myofascial pain but did not cite specific clinical findings based on examinations, his determination is inconsistent with the agency doctors' determinations, the functional limitations reported in his assessment are not supported by the reports of other examining physicians, his assessment is not supported by diagnostic studies of plaintiff's lumbar spine, and his assessment is inconsistent with the functional assessment of Dr. Pathak. (Tr. at 23, 27.)

In his evaluation of the evidence, the ALJ refers to the records of plaintiff's therapist, and notes that Mr. Yankauer had treated plaintiff for at least a year "for major

depression and a pain disorder, and GAF was consistently rated in the 60's." However, the ALJ

then focuses exclusively on those aspects of the therapist's findings that do not support plaintiff's

allegations of disability. The ALJ describes Mr. Yankauer's April 2002 mental medical source

statement as indicating that plaintiff "had unlimited/very good to fair ability in making

occupational adjustments, performance adjustments, and personal-social adjustments," entirely

omitting the therapist's indications of marked difficulties in the areas of concentration, memory,

understanding and judgment. (Tr. at 24 (citing Exhibit 21F[4]).) The ALJ also uses the positive

aspects of Mr. Yankauer's assessment to discount plaintiff's subjective complaints of mental

impairments:

> First, the undersigned finds [the claimant's] mental complaints
> were not credible prior to March 28, 2002 because the mental MSS
> [medical source statement] completed by Mr. Yankauer establishes
> the claimant did not have a poor or no ability to make
> occupational, performance, or personal-social adjustments (Exhibit
> 21F); there was no evidence of treatment, except with medication,
> prior to her treatment with Mr. Yankauer; and there was no
> evidence of any treatment by a psychiatrist or psychologist. Next,
> she had not been hospitalized; there was no evidence of any
> emergency room treatment; and no examining or treating physician
> indicated that she was disabled due to any mental condition or that
> she had any functional mental limitations. Dr. Hendrickson did not
> identify any mental limitations in his medical assessment (Exhibit
> 16F); Dr. Pathak's CE [consultative examination] did not identify
> any functional mental limitations (Exhibit 7F); Dr. Hassan's initial
> evaluation in January 2000, which included a limited mental status
> examination, led to him indicate [sic] that there was some
> difficulty with abstract reasoning on proverb interpretation and
> probably difficulty with concentration and that her judgment,
> orientation, memory, attention span, and concentration were good
> to very good, which do not support her mental complaints as
> alleged (Exhibit 10F, p 11); there was no evidence of any crisis
> center contacts; there was no evidence of any group therapy; and
> there was no evidence or testimony that she has sought help for her
> mental complaints from United Way or church organizations.

> Hence, the undersigned finds that while she has been treated for
> depression and post traumatic stress syndrome on a limited basis,

---

[4] Exhibit 21F contain medical records from Marshall Hospital in 2001. (Tr. at 447-92.)
Exhibit 20F contains Mark Yankauer's medical records from May 16, 2001 to May 15, 2002.
(Tr. at 425-46.)

the overall record and her testimony fail to establish that she has a
severe mental impairment.  As a result, her residual functional
capacity is not eroded by any of her mental complaints prior to
March 28, 2002.

(Tr. at 26.)  On these findings, the ALJ concluded, as he had in his first decision, that the non-

treating, non-examining state agency physicians' form assessments in February and May 2001

"were the most reliable in establishing [the claimant's] residual functional capacity and were well

supported by the overall record." (Tr. at 28.)  Relying on the state agency physicians' opinions

and rejecting the opinions of Mr. Yankauer, the ALJ found that plaintiff had no mental

impairments that were severe and, indeed, that plaintiff has no mental limitations at all.  (Tr. at

29-30.)

        Plaintiff offers a detailed analysis of the ALJ's reasons for rejecting the treating

physician's opinion of plaintiff's physical RFC and urges the court to find that Dr. Hendrickson's

assessment is entitled to special weight, is not contradicted by other evidence in the record, and

requires that plaintiff be found disabled.  (Pl.'s Mot. for J. on the Pleadings at 24-29.)  While

plaintiff takes a less exhaustive approach to the analysis of the ALJ's reasons for rejecting the

treating therapist's assessment of plaintiff's mental RFC, plaintiff cites portions of the record that

demonstrate the flaws in the ALJ's analysis of plaintiff's psychiatric residual functional capacity

and urges the court to find that the therapist's assessment is also entitled to special weight and

establishes disability, either under Listed Impairment 12.04, Affective Disorders, or by

demonstrating that plaintiff lacks the RFC to perform sedentary work.  (Id. at 30-35.)

        The court finds that the ALJ's stated reasons for giving little weight to Dr.

Hendrickson's opinion are inadequate.  The record shows that Dr. Hendrickson's March 16, 2001

medical assessment of plaintiff's physical ability to do work related activities is in fact supported

by his records.  Dr. Hendrickson prepared a detailed report of his initial pain management

consultation with plaintiff on December 7, 2000, when he saw her on referral from her family

physician.  (Tr. at 361-65.)  Dr. Hendrickson noted "a very complicated and complex history of

multiple sites of pain" and multiple trigger point injections by Dr. Wood in the past.  (Tr. at 361.)

He also noted plaintiff's history of Guillan-Barre syndrome and fibromyalgia.  (Tr. at 362.)

Plaintiff's chief complaint at the time of her initial consultation with Dr. Hendrickson concerned

cervical neck pain, and, at her request, he focused on the cervical region.  (Tr. at 361, 365.)

Plaintiff reported that her neck pain was exacerbated by turning her head, looking up or down,

and riding in vehicles.  (Id.)  Dr. Hendrickson reviewed imaging studies of plaintiff's cervical

spine dated December 23, 1998 and May 12, 2000, and performed his own examination of

plaintiff.  (Tr. at 363-64.)  He found loss of motion of greater than 50% in all planes for the

cervical spine.  (Tr. at 364.)  He diagnosed cervical degenerative disk disease and set a primary

goal of increasing function and a secondary goal of decreasing pain.  (Tr. at 365.)  This report

contains clinical and diagnostic findings that support Dr. Hendrickson's diagnosis and goals.

Dr. Hendrickson then began treating plaintiff and had seen her two more times

before he completed the functional assessment form on March 16, 2001.  When he saw plaintiff

on January 4, 2001, he noted that her pain had increased despite the use of lidoderm patches, and

she had been unable to increase any activities of daily living, such as vacuuming, laundry,

cleaning, and washing dishes.  He diagnosed cervical degenerative disk disease and myofascial

pain syndrome, and scheduled trigger point injections.  (Tr. at 359-60.)  When he saw plaintiff on

January 25, 2001, he noted that her pain had been increased by the H-wave treatment, and she

had not increased any activities of daily living.  He administered trigger point injections on that

date and instructed plaintiff to continue with chiropractic care for eight weeks.  (Tr. at 357-58.)

Dr. Hendrickson saw plaintiff on March 22, 2001, less than a week after he completed the

functional assessment form.  He recorded that her chief complaints on that date were of neck

pain, shoulder pain, and headaches.  He  noted that she had been unable to increase her activities

of daily living and that her fibromyalgia was a factor.  (Tr. at 355-56.)

Dr. Hendrickson continued to treat plaintiff during the time period at issue in this

case.  (Tr. at 493-503.)  His diagnoses remained the same, and plaintiff continued to complain of

neck pain and difficulty sleeping due to pain. On May 31, 2001, plaintiff, whose medications then included Vicodin, Cafergot, Ambien, Soma, and Effexor, reported that her pain had decreased, but her overall activity and activities of daily living had not increased since the last visit. (Tr. at 503.) On August 23, 2001, plaintiff, whose medications then included Cafergot, Ambien, and Prozac, reported that her pain had increased and her overall activity and activities of daily living had not increased from the last visit. Dr. Hendrickson noted that the only option left was medical management, and that he planned to search for a medication that worked beginning with Ultram. (Tr. at 501.) On September 18, 2001, plaintiff, whose medications then included Cafergot, Vicodin, Prozac, and Ultram, reported that her pain had not changed and her overall activity and activities of daily living had not increased from the last visit. She complained of headaches and a feeling of being "drunk." Dr. Hendrickson discontinued the Ultram and prescribed Oxycontin. (Tr. at 499.) On November 29, 2001, plaintiff, whose medications then included Cafergot, Prozac, Oxycontin, Ambien, and Prevacid, reported neck, shoulder, and chest pain. She reported that her pain had decreased but was still interfering with sleep. Her overall activity had increased, but her activities of daily living had not increased from the last visit. Dr. Hendrickson continued Oxycontin at the same dose. (Tr. at 497.) On January 23, 2002, plaintiff, whose medications then included Cafergot, Prozac, Ambien, Reglan, Oxycontin, and Soma, reported that her pain had increased and was still interfering with sleep. Her overall activity had increased, however, and for the first time her activities of daily living had also increased from the last visit. Dr. Hendrickson found plaintiff stable on the current medications and instructed her to continue home strengthening exercises and heat therapy. (Tr. at 495.) On March 21, 2002, six days prior to her 50th birthday, plaintiff reported that her pain had increased and was still interfering with sleep. Her overall activity and her activities of daily living had both increased from the last visit. However, the Oxycontin was no longer working well for her and upset her stomach. Dr. Hendrickson discontinued the Oxycontin and prescribed Methadone. (Tr. at 493.)

/////

Dr. Hendrickson's records prior to and near the time of his March 16, 2001 functional assessment of plaintiff's physical ability to do work related activities, reflected that she was unable to lift or carry more than five pounds at a time, unable to sit more than three hours in an eight-hour day, and unable to stand or walk more than three hours in an eight-hour day, with significant postural limitations precluding climbing, balancing, stooping, crouching, kneeling, crawling, and bending, and only occasional reaching, handling, feeling, pushing, and pulling. His records for the remainder of the time period at issue do not reflect that plaintiff's physical ability to do work related activities improved. The undersigned finds that the ALJ erred in giving minimal weight to Dr. Hendrickson's opinions on the ground that the medical source statement was not supported by the doctor's records.

The ALJ also asserted that Dr. Hendrickson "indicated chronic myofascial pain, not any specific clinical findings based upon examinations" and that Dr. Hendrickson's assessment was not supported by the diagnostic studies of her lumbar spine. (Tr. at 23-24.) With regard to the latter, the ALJ cited a lumbar spine series completed on September 21, 1999, showing no evidence of acute fracture, subluxation, or compromise of the intervertebral disc spaces or neural foramina. (Tr. at 24 (citing Ex. 3F at 8 [tr. at 264].) The ALJ also cited reports by Drs. Molitor, Hassan, and Powers without citing specific pages or explaining the significance of his citations. (Tr. at 24 (citing Exs. 9F-10F & 12F [tr. at 307-09, 310-20, 325-40].) The reports cited by the ALJ instead appear to support Dr. Hendrickson's assessment. After performing an MRI of the lumbar spine on May 3, 2000, Dr. Powers noted in his report that "the magnetic resonance imaging examination of the lumbar spine is primarily an anatomic study," not a test of nerve physiology, and that physiologic/pain consequences "would have to be determined by the patient's complaints, physical findings and other physiologic tests available." (Tr. at 338.) On May 11, 2000, Dr. Hassan reviewed the MRI performed by Dr. Powers and saw "evidence of a disruption of the annulus fibrosum at L3-4-5, which would be related to an acute

/////

16

injury" and opined that "[t]he pain the patient presently describes is most likely secondary to that injury." (Tr. at 311.)

In addition, plaintiff argues persuasively that it was not appropriate for the ALJ to expect evidence of plaintiff's chronic myofascial pain in the form of specific clinical findings based on examination or in the form of diagnostic studies of the lumbar spine. Prior to Dr. Hendrickson's diagnosis of myofascial pain, a diagnosis of fibromyalgia had been made by many other treating and examining physicians, including Dr. Pathak, one of the Social Security Administration's consultative examiners. (See tr. at 297.) In his report dated December 29, 1999, Dr. Pathak stated that plaintiff had a history consistent with fibromyalgia and, upon examination, he found her to have generalized weakness and diffuse muscle tenderness consistent with fibromyalgia. (Id.) On January 12, 2000, orthopedist Dr. Molitor noted that chronic pain such as that described by plaintiff is not uncommon after an accident and could be related to fibromyalgia. (Tr. at 309.) On January 27, 2000, treating physician Dr. Hassan wrote that "this kind of accident with the daughter in the car would leave a patient with a tremendous amount of stress, depression and anxiety over time" and would worsen the condition of neck, mid-back and low-back pain. (Tr. at 320.) Dr. Hassan stated further that "fibromyalgia does worsen with both psychological stress and auto accidents." (Id.) Dr. Hendrickson noted this history of fibromyalgia on his first examination of plaintiff, included myofascial pain syndrome in his diagnosis on plaintiff's second visit and scheduled trigger point injections, included "myofascial pain syndrome/fibromyalgia" in his diagnoses at the third and fourth visits, and administered trigger point injections at the third visit. (Tr. at 362, 359, 357, 355.)

As consultative examiner Dr. Pathak observed, "[t]here are no laboratory tests which confirm the diagnosis of fibromyalgia," and functional assessment in such cases is difficult "because typically [patients] do not have any findings on examination." (Tr. at 297-98.) Fibromyalgia is a physical disease, Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 873 (9th Cir. 2004), and its "[c]ommon symptoms . . . include chronic pain

throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease," Benecke v. Barnhart, 379 F.3d 587, 589-90 (9th Cir. 2004).  Fibromyalgia is diagnosed entirely on the basis of a patient's subjective reports of pain and other symptoms, and, although there is a generally agreed-upon set of diagnostic criteria, there are no laboratory tests that will confirm the diagnosis.  Benecke, 379 F.3d at 589-90; Jordan, 370 F.3d at 872; Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001).

At plaintiff's initial consultation with Dr. Hendrickson, she had reported pain radiating from her neck to her head, left shoulder, upper back, ears, and eyes.  (Tr. at 361.)  Dr. Hendrickson had reviewed her history, found her positive for PTSD, and noted bilateral myofascial trapezius tenderness and dysfunction.  (Tr. at 363, 365.)  On subsequent visits, plaintiff regularly reported difficulty sleeping due to pain, and Dr. Hendrickson regularly noted tender points.  (Tr. at 359, 357, 355.)  The undersigned finds that the ALJ's criticism of Dr. Hendrickson's indication of chronic myofascial pain without "specific clinical findings" and without support from diagnostic studies of her lumbar spine fails to provide a valid reason to give little weight to the treating physician's functional assessment.

The ALJ also gave little weight to Dr. Hendrickson's opinion on the grounds that Dr. Hendrickson did not refer plaintiff to specialists or to a pain clinic.  Dr. Hendrickson is a specialist in pain management, and he practices in a pain clinic.[5]  When Dr. Hendrickson began to treat plaintiff in December 2000, plaintiff had been examined or treated by specialists in neurology (Dr. Seminar, tr. at 279, Dr. Hassan, tr. at 314), acupuncture (tr. at 269), chiropractics (D.C. Martin, tr. at 266, D.C. Sloan, tr. at 386), rheumatology (Dr. Woods, tr. at 292), orthopedics (Dr. Molitor, tr. at 307, Dr. Hassan, tr. at 314), sports medicine (Dr. Hassan, tr. at

_____

[5] Dr. Hendrickson's letterhead indicates that he is a Fellowship Trained Pain Management Specialist and practices medicine at El Dorado Hills Pain Management Physicians. (Tr. at 361.)

314), pulmonology (Dr. Massey, tr. at 469), pain management (Drs. Singleton and Mackay, tr. at 527), and mental health (M.F.T. Yankauer, tr. at 427). The ALJ did not suggest any referral that Dr. Hendrickson should have made. The asserted failure to refer plaintiff to specialists or to a pain clinic was also not a valid reason to give little weight to the treating physician's functional assessment.

The ALJ also stated that Dr. Hendrickson did not hospitalize plaintiff and did not administer any pain injections. The record does not indicate any reason for Dr. Hendrickson to hospitalize plaintiff,[6] and Dr. Hendrickson did in fact administer trigger point injections. (Tr. at 357-65.) Thus, these two reasons given by the ALJ fail to justify his decision to give little weight to the treating physician's functional assessment.

Finally, the undersigned is unpersuaded by the ALJ's conclusory contentions that "the reports from other examining physicians do not support [Dr. Hendrickson's] functional limitations" and that Dr. Hendrickson's functional assessment is inconsistent with examining physician Dr. Pathak's assessment and the determinations of three agency doctors. (Tr. at 23-24.)

The ALJ's reference to "other examining physicians" is unexplained and is not supported by citations to exhibits. Plaintiff suggests that the examining physician most likely to express an opinion contrary to Dr. Hendrickson's was Pierre M. Dreyfus, M.D., the board-certified neurologist who served as independent medical examiner for the defense in plaintiff's civil suit arising from the motor vehicle accident. Dr. Dreyfus saw and evaluated plaintiff on September 27, 2000. (Tr. at 341.) In his October 24, 2000 report, he concluded that plaintiff "has been disabled since the motor vehicle accident of 10/7/98 and has not been able to work." (Tr. at 354.) He diagnosed musculoligamentous strain of the cervical, thoracic, and lumbosacral spine; fibromyalgia; and post-traumatic stress syndrome and depression. (Tr. at 352.) Dr.

_____

[6] Plaintiff was seen in a hospital after the accident in 1998, and she was hospitalized three years later for surgery to remove implants ruptured by the accident. (Tr. at 407-24, 525.)

Dreyfus noted that plaintiff had been diagnosed as having fibromyalgia eight years previously, and he opined that the diagnosis was correct. (Id.) He observed that the condition of fibromyalgia is confusing and often misunderstood, consists of generalized muscular pain and fatigue, and is characterized by pain as the most prominent symptom, with a worsening of symptoms following stressful situations such as motor vehicle accidents. (Tr. at 352-53.) Upon examination, he found pain and tenderness in plaintiff's cervical and lumbosacral spine. His medical opinion was that plaintiff's prognosis was guarded, in view of the fact that she had been suffering from fibromyalgia, depression and a sleep disorder for several years. (Tr. at 353-54.) In contrast to this guarded prognosis two years after plaintiff's motor vehicle accident, Dr. Dreyfus observed that, under normal circumstances, an individual who receives appropriate treatment after a motor vehicle accident should be able to return to work two years later. (Tr. at 354.) The report of this examining physician plainly supports the functional limitations found by Dr. Hendrickson.

Nor does the court find Dr. Pathak's assessment inconsistent with Dr. Hendrickson's. Dr. Pathak completed an internal medicine evaluation and examination of plaintiff on December 29, 1999. (Tr. at 294-98.) Dr. Pathak confirmed plaintiff's diagnosis of fibromyalgia and her symptoms of generalized weakness and diffuse muscle tenderness. (Tr. at 297.) He noted that functional assessment is such a patient is very difficult and that in such a case it is appropriate to take into consideration subjective symptoms. (Tr. at 298.) However, "[b]ased on physical findings alone," Dr. Pathak found that plaintiff could sit for about 6 hours in an 8-hour day, stand and/or walk for 6 hours in an 8-hour day, lift 10 pounds on a frequent basis, and lift up to 25 pounds occasionally, but had poor vision in the left eye. (Id.) Dr. Pathak explained in a deposition, taken in plaintiff's civil suit, that he described plaintiff's pain in his report but did not take it into consideration when assessing her functional capacity in accordance with the instructions of the Social Security Administration. (Tr. at 223.) He testified that since plaintiff's symptoms are primarily of pain, her limitations depend on her tolerance of or response

to pain.  (Tr. at 222.)  When plaintiff's response to pain, which was recorded regularly by Dr.

Hendrickson during the time period at issue, is factored into Dr. Pathak's assessment based on

physical findings alone, it appears that plaintiff cannot sit for 6 hours in an 8-hour day, stand

and/or walk for 6 hours in an 8-hour day, lift 10 pounds on a frequent basis, or lift up to 25

pounds occasionally.  Dr. Pathak's assessment based on physical findings alone does not provide

a legitimate basis for rejecting the treating physician's assessment of plaintiff's RFC with her

pain being taken into consideration..

   The ALJ cited three determinations by agency doctors.  (Tr. at 23, citing Exs. 8F

[tr. at 299-305[7]], 15F [tr. at 366-72[8]] & 17F [tr. at 377-84].)  The record contains only one

complete determination, and that is dated May 3, 2001 and signed by Richard Sun, M.D.  (Tr. at

384.)  Therein, Dr. Sun indicated that plaintiff's primary diagnosis is fibromyalgia with a

secondary diagnosis of "back strains."  (Tr. at 377.)  He acknowledged records documenting

fibromyalgia from 1999 up to the date of his assessment.  (Tr. at 378-79.)  He assessed plaintiff

as able to lift and carry up to 10 pounds occasionally and less than 10 pounds frequently, able to

stand and/or walk at least 2 hours per day, able to sit for about 6 hours per day, and unlimited in

the ability to push and/or pull.  (Tr. at 378.)  Dr. Sun dismissed plaintiff's symptoms as not fully

credible because her "pains are far out of proportion with objective findings" and " [t]here is no

reasonable chance that a person with the minimal physical findings, including normal neurologic

exams (like the claimant) is incapable of 'sed' [sedentary] work."  (Tr. at 382-83 (emphasis in

original).)  Dr. Sun failed to recognize that fibromyalgia is diagnosed entirely on the basis of a

---

[7]  Exhibit 8F is a form that contains eight pages.  The eighth page of the form, which should be page 306 of the transcript, is missing or out of order.  No page 306 appears between pages 305 and 307.  In the absence of a page that bears a date and signature, this exhibit is given no evidentiary weight by the court.

[8]  Exhibit 15F is a form that contains eight pages.  The eighth page of the form, which should be page 373 of the transcript, is missing or out of order.  No page 373 appears between pages 372 and 374.  Instead, a duplicate of page 273 has been inserted in place of page 373.  In the absence of a page that bears a date and signature, this exhibit is likewise given no evidentiary weight by the court.

patient's subjective reports of pain and related symptoms. Without having treated or examined plaintiff, he dismissed her subjective complaints without the support of independent clinical findings or a record of malingering. The agency doctor's assessment does not provide a legitimate basis for giving little weight to the treating physician's opinions about plaintiff's RFC during the period of time at issue.

The record does not reflect that Dr. Hendrickson's opinion with respect to plaintiff's RFC prior to March 28, 2002 is contradicted by the opinion of any other treating physician. To the extent that Dr. Hendrickson's opinion varies from that of any examining physician, the variation appears to arise from the examining physician's failure to consider the nature of fibromyalgia and plaintiff's subjective complaints of pain in determining RFC. No examining physician's opinion contradicts Dr. Hendrickson's opinion on the basis of different, independent clinical findings, such that the ALJ would have been entitled to resolve the conflict. Accordingly, the treating physician's opinion should be given greater weight than the opinions of the examining physicians' opinions. Although the agency physician's opinions are inconsistent with Dr. Hendrickson's, those opinions should be given no weight because they are not supported by other evidence.

Under the standards applicable to medical opinions, the opinion of Dr. Hendrickson may be rejected only for clear and convincing reasons. For the reasons discussed above, the court finds that the ALJ's reasons for rejecting Dr. Hendrickson's assessment fall far short of being clear and convincing. Although the ALJ provided numerous reasons for rejecting Dr. Hendrickson's assessment, those reasons are not legitimate nor are they supported by substantial evidence in the record. Accordingly, the ALJ improperly rejected the opinion of treating physician Dr. Hendrickson with respect to plaintiff's RFC prior to March 28, 2002. When the treating physician's assessment is properly credited, it demonstrates that plaintiff was unable to perform sedentary work from the time of her accident on October 7, 1998 through March 28, 2002.

The ALJ also improperly rejected the opinion of therapist Mark Yankauer after acknowledging that he treated plaintiff for major depression and a pain disorder for over a year during the relevant time period. (Tr. at 24.) The ALJ found plaintiff's mental complaints not credible during the time prior to March 28, 2002 because Mr. Yankauer did not find that plaintiff had "poor or no ability" to make occupational, performance, or personal-social adjustments. (Tr. at 26.) However, the form completed by Mr. Yankauer defines "poor or none" as meaning "no useful ability to function" in the category, (tr. at 427) and the Commissioner has cited no authority for the proposition that a claimant is required to have no useful ability in a particular category in order to demonstrate the existence of credible mental complaints. The ALJ also found plaintiff's mental complaints not credible because there was "no evidence of treatment, except with medication, prior to her treatment with Mr. Yankauer," there was "no evidence of any treatment by a psychiatrist or psychologist," and "there was no evidence of any emergency room treatment." (Tr. at 26.) Mr. Yankauer's records reflect that plaintiff received outpatient therapy from Bill Blazek, M.F.T., from November 2000 to January 2001, prior to commencing treatment with Mr. Yankauer in May 2001. (Tr. at 439, 441, 443.) It is true that there is no evidence in the record of plaintiff's treatment by a psychiatrist or psychologist or of hospitalization or emergency room treatment. However, the Commissioner again cites no requirement that mental health care be obtained from a psychiatrist or psychologist or that a person be hospitalized or receive emergency room treatment in order to establish the existence of a mental impairment. The ALJ also found plaintiff's mental complaints not credible because "no examining or treating physician indicated that she was disabled due to any mental condition or that she had any functional mental limitations." (Tr. at 26) However, the record reflects that Dr. Hendrickson and other treating and examining physicians noted that plaintiff suffered from stress, anxiety, depression, and PTSD, as well as the interplay between those conditions and fibromyalgia. (Tr. at 307-09, 314-20, 341-54, 361-65, 426-46, 527-29, 512-18.)

/////

When the opinions of Dr. Hendrickson and Mr. Yankauer are properly credited, there is substantial evidence that plaintiff's physical and mental RFC did not permit her to perform a full range of work at the sedentary exertional level from October 7, 1998 to March 28, 2002, the date as of which the ALJ previously found plaintiff disabled.

**CONCLUSION**

The undersigned finds that the ALJ's RFC determination for the period prior to March 28, 2002 is not supported by substantial evidence in the record. The medical opinions of treating medical professionals demonstrate that plaintiff did not have the RFC to perform a full range of sedentary work between October 7, 1998 and March 28, 2002. If the medical opinions are properly credited, the record demonstrates that plaintiff should have been found disabled for the period prior to March 28, 2002.

The decision whether to remand a case for additional evidence or to simply award benefits is within the discretion of the court. Ghokassian v. Shalala, 41 F.3d 1300, 1304 (9th Cir. 1994); Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990). The Ninth Circuit has stated that, "[g]enerally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed." Ghokassian, 41 F.3d at 1304 (citing Varney v. Sec'y of Health & Human Servs., 859 F.2d 1396, 1399 (9th Cir. 1988)). This rule recognizes the importance of expediting disability claims. Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001); Ghokassian, 41 F.3d at 1304; Varney, 859 F.2d at 1401.

Plaintiff's disability application was filed on August 30, 2000, more than eight years ago. The record has been adequately developed and establishes that plaintiff was disabled during the period of time at issue. No useful purpose would be served by further administrative proceedings. This matter will therefore be remanded with the direction to award benefits for the period from October 7, 1998, to March 28, 2002, the date on which plaintiff was previously determined to be disabled. See Moore v. Comm'r of Soc. Sec. Admin, 278 F.3d 920, 925 (9th

Cir. 2002) (remanding for payment of benefits where the ALJ improperly rejected the testimony of the plaintiff's examining physicians); Ghokassian, 41 F.3d at 1304 (awarding benefits where the ALJ "improperly discounted the opinion of the treating physician").

Accordingly, IT IS ORDERED that:

1.  Plaintiff's August 21, 2007 motion for judgment on the pleadings (Doc. No. 12) is granted;

2.  Defendant's September 21, 2007 cross-motion for summary judgment (Doc. No. 13) is denied;

3.  The decision of the Commissioner of Social Security is reversed; and

4.  This case is remanded with the direction to award benefits for disability from October 7, 1998 to March 28, 2002.

DATED: April 20, 2009.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:kw
Ddad1/orders.socsec/wilberg0591.order